# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF VIRGINIA
# ABINGDON DIVISION

| | | |
|---|---|---|
| **ALICE M. SMITH,** | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 1:11CV00002 |
| | ) | |
| v. | ) | **OPINION** |
| | ) | |
| **MICHAEL J. ASTRUE,** | ) | By: James P. Jones |
| **COMMISSIONER OF** | ) | United States District Judge |
| **SOCIAL SECURITY,** | ) | |
| | ) | |
| Defendant. | ) | |

*Gregory R. Herrell, Arrington Schelin & Herrell, P.C., Bristol, Virginia, for Plaintiff; Eric P. Kressman, Regional Chief Counsel, Region III, Elizabeth A. Corritore, Assistant Regional Counsel, Office of the General Counsel, Social Security Administration, and Allyson Jozwik, Special Assistant United States Attorney, Philadelphia, Pennsylvania, for Defendant.*

In this social security case, I affirm the final decision of the Commissioner.

I

Plaintiff Alice M. Smith filed this claim challenging the final decision of the Commissioner of Social Security (the "Commissioner") denying her claim for disability insurance benefits and supplemental security income, pursuant to Titles II and XVI of the Social Security Act (the "Act"), 42 U.S.C.A. §§ 401-433; 1381-

1383f (West 2003 & Supp. 2011). Jurisdiction of this court exists pursuant to 42 U.S.C.A. §§ 405(g) and 1383(c)(3).

Smith filed an application for benefits on March 28, 2008, alleging that she had been disabled since October 1, 2004. Smith claimed that she was disabled due to an injury to her left arm, depression, high blood pressure and sleep apnea. Her claim was denied initially and upon reconsideration. Smith received a hearing before an administrative law judge ("ALJ"), during which Smith, represented by counsel, and a vocational expert testified. The ALJ denied her claim and the Social Security Administration Appeals Council denied her Request for Reconsideration. Smith then filed her Complaint with this court, objecting to the Commissioner's final decision.

The parties have filed cross motions for summary judgment, which have been briefed. The case is ripe for decision.

II

Smith was born on October 28, 1957, making her a younger individual under the regulations at the time of her alleged onset date. 20 C.F.R. §§ 404.1563(c); 416.963(c) (2011). At the time of the ALJ's decision, May 19, 2010, she had moved into the age category of a "person closely approaching advanced age." 20

C.F.R. §§ 404.1563(d); 416.963(d) (2011). She attended school through the eighth grade and did not earn a general equivalency diploma.

Prior to the alleged onset of her disability, Smith had worked as a certified nursing assistant ("CNA"). That job required her to lift up to 100 pounds. (R. at 27.) In 2002, her left arm was injured at work. She is right-handed. She stopped working in 2004 and has not engaged in any substantial gainful activity since that time.

Smith saw Peter Terok, M.D., on August 30, 2002 for pain in her left elbow resulting from the injury at work. Dr. Terok diagnosed left elbow medial epicondyiltis and left elbow cubtial tunnel syndrome and ordered EMG nerve conduction studies to determine the extent of irritation to her ulnar nerve. The results of those studies were normal. Dr. Terok referred Smith to a physical therapist and she was seen at Heartland Rehabilitation Services on September 18, 2002.

On February 3, 2003, Smith saw William Mirenda, M.D., with Roanoke Orthopaedic Center, for a second opinion on her elbow. He concurred with Dr. Terok that Smith's symptoms indicate medial epicondylitis and gave her a steroid injection. He also recommended that she return in 2-3 weeks for a surgical consultation with Hugh Hagan, III, M.D.

Smith saw Dr. Hagan on February 25, 2003. He concurred with the prior diagnoses of medial epicondylitis and posited a differential diagnosis including a partial medial collateral ligament tear. He recommended an MRI, the results of which were normal. He felt that she could work her normal job without restrictions. Smith saw Dr. Hagan on May 8, 2003 for follow-up. He noted that her medial epicondylitis continued to be symptomatic despite eight months of conservative treatment. After discussion with Dr. Hagan, Smith decided undergo a left medial partial epicondylectomy.

Smith appeared to be doing well one week after the surgery. Dr. Hagan noted she did not have any neurologic symptoms, did not have a lot of pain and had good range of motion. She continued to improve and at her January 7, 2004 appointment, Dr. Hagan decided to change her work restriction to "light use of left arm, five pound weight lifting restrictions, no repetitive use." (R. at 249.)

Three months post-surgery, Smith continued to improve and her only symptom was a bit of soreness when trying to extend her arm fully. She was tolerating her light duty workload and Dr. Hagan increased her functional work ability to lifting twenty-five pounds. In May 2004, Smith was still feeling some occasional pain but it was much better than before the operation. She had full extension and flexion of her elbow but Dr. Hagan estimated that she had ten

percent upper extremity impairment on her left side due to grip strength. He released her to unrestricted work duty.

Smith returned to Dr. Hagan in August of 2004 complaining of increased arm pain. Dr. Hagan found nothing suggestive of an infection or dystrophy or other explanation for the pain. He concluded it was a continuing symptom of her chronic long-term medial epicondylitis. He noted that she was having significant problems at work and was on a three-day a week capacity. He suspected that she might need vocational retraining to participate in a full unrestricted schedule within her capabilities and maintained her on a three-day restriction. Smith returned to Dr. Hagan in October 2004 complaining of global left arm pain. She was no longer working. Hagan observed that she was still tender over the medial epicondyle.

Smith saw Mark Swanson, M.D., at Pain Management Center of Roanoke on October 25, 2004. She described her pain as "cramping and tender" and in the four to five range with escalations into the six to eight range several days a week. (R. at 258.) The pain had escalated significantly over the last 2-3 months. She reported that she had become progressively depressed and anxious. Dr. Swanson noted that she was alert and pleasant. He noted some left arm guarding, decreased range of motion in the left shoulder and elbow and tenderness over the incision. Dr. Swanson concluded that they should focus on developing a pain medication

regimen that would enable her to use and strengthen her arm to regain muscle mass. He felt that there was potential for her to be much better if she cut down on cigarette smoking, added protein to her diet and made a "mild effort at reconditioning." (R. at 261.) He did not support her thought of applying for Social Security Disability. He prescribed medication for sleep.

Smith saw Dr. Hagan again in January 2005 and reported that she continued to have medial elbow pain and expressed concern about her abilities to do her job in a nursing home environment. Dr. Hagan noted tenderness over the medial epicondyle and a full range of elbow, finger and hand motion. He gave her a steroid injection which failed to resolve the issue, as she reported in her February 2005 appointment. Dr. Hagan decided to impose a permanent work restriction to light work with twenty pounds lifting and an avoidance of direct patient contact, lifting or assisting in mobility of patients. Dr. Hagan concluded that Smith had reached "maximum medical improvement" and encouraged efforts to employ her within the restrictions he imposed. (R. at 241.)

On April 6, 2005, at Dr. Hagan's recommendation, Smith presented to Leslie Houde, MS, OTR/L, for a functional capacity evaluation. Houde concluded that Smith could return to full-time employment of medium-level work lifting up to thirty pounds occasionally. Houde qualified that Smith should only use her left arm occasionally for repetitive use, overhead reaching, or full extension or flexion.

Hagan agreed with this assessment at a follow-up appointment and estimated "a ten percent left upper extremity permanent impairment due to some residual weakness." (R. at 240.)

Smith returned to Dr. Swanson in July 2005 and complained primarily of struggles with sleep. She told Dr. Swanson that during the day she could "manage her pain with pacing and focusing on other things." (R. at 289.) Dr. Swanson described her as "alert, pleasant and animated." (*Id.*) He prescribed a low-dose Lortab in conjunction with the lorazepam to help with her sleep and instructed her in doing gentle reconditioning to try to improve her arm strength.

Smith saw Dr. Hagan in September 2005 and he observed the same tenderness in her elbow as he had in the past. Smith reported that her family physician, Karen Elmore, M.D. with Saltville Medical Clinic, had prescribed Effexor for depression and it had been "tremendously effective." (R. at 239.) Dr. Hagan felt she should continue with the Effexor.

Smith saw Dr. Swanson in December 2005 and reported that she could perform daily tasks, her arm strength was improving, her sleep quality was stable and she was looking for non-labor intensive work. Dr. Swanson described her as "alert and pleasant." (R. at 239.) He decided to maintain the course of treatment. The situation was much the same at her June 2006 appointment.

-7-

Case 1:11-cv-00002-JPJ-PMS   Document 23   Filed 11/30/11   Page 7 of 17   Pageid#: 489

Smith was seen by James McVey, M.D., and Donna Davis, R.N.C.S., F.N.P., with the Washington Square Clinic starting December 2006. She was primarily treated for high blood pressure and the clinic also started managing her prescriptions, including her pain and depression medications. At her January 2006 appointment, Davis observed that Smith's affect was "flat and depressed," that she didn't smile and that she did not "seem to have anything that is very positive to talk about." (R. at 317.) Dr. McVey successfully treated her blood pressure with various medications. At her July 2008 appointment, Dr. McVey noted that her depression was stabilized. At her September 2008 appointment he described her as "alert, appropriate and cooperative" but also noted she had chronic anxiety. (R. at 309.) Davis described her as "alert, appropriate and cooperative" at her February 2009 appointment. (R. at 373.) Davis also noted that without the Lortab, Smith could not cope with the pain in her upper left arm and that she "just can't work with all this pain." (*Id.*)

Smith returned to Dr. Swanson, now with Lewis-Gale Physicians, in April 2007. Swanson felt that she could not do repetitive lifting work but noted that her pain scores were stable and that her range of motion with the elbow was "really quite good." (R. at 304.) He discussed her depression with her and continued Effexor. He also continued the Lortab prescription. In August 2007, Christina

Zysk, PA-C, also with Lewis-Gale, gave her a prescription of Lunesta for sleep. There were no major developments in her treatment plan up through March 2008.

Smith presented at the Abingdon Center in August 2008 for mental health treatment. The treatment provider diagnosed her with major depressive disorder (recurrent) and panic disorder with agoraphobia. (R. at 365.) The treatment plan was for weekly sessions to reduce her anxiety and depression and improve her coping skills. However, Smith apparently only attended four sessions from August to November and her treatment was terminated in November.

In December 2008, Smith was evaluated by state agency physician Brian Strain, M.D., who assessed her physical residual functional capacity ("RFC"). Dr. Strain concluded that Smith's impairments did not prevent her from performing light work (occasionally lifting and/or carrying up to twenty pounds with frequent lifting and/or carrying of up to ten pounds) with limited reaching in all directions. Also in December 2008, state agency psychologist Howard Leizer, Ph.D., concluded that Smith did not have a severe mental impairment.

Smith also underwent a psychological evaluation by John Ludgate, Ph.D. in March 2009. Dr. Ludgate concluded that Smith was clinically depressed but also noted that her comprehension was normal and judgment and insight were good, her attention span was adequate and there was no evidence of psychosis or thought disorder. He administered several tests which diagnosed Smith with major

depressive disorder, recurrent and moderate and without psychosis, and generalized anxiety disorder. He concluded that her "depression and anxiety would interfere with any job involving service to the public." (R. at 354.) He also concluded that she had no useful ability to deal with work stress, maintain attention and concentration, or behave in an emotionally stable manner.

In April 2009, Smith presented to Tazewell Community Services for help with depression and anxiety. Donna Havens, LCSW, observed that Smith presented with an "angry/depressed affect and mood." (R. at 388.) Havens further observed that Smith was oriented and had no noticeable thought disorder. Smith also told Havens that she had "constant pain in her arm and hurting all over" and difficulty sleeping. (*Id.*) Havens recommended individual therapy. At her next visits, Havens described Smith as alert and oriented but with a depressed and anxious mood/affect. In July 2009, she was seen via teleconference with Juliana Frosch, a psychiatric nurse practitioner, who started her on Cymbalta.[1] Frosch diagnosed her as having major depressive disorder severe and panic disorder. (R. at 378.)

Smith was maintained on the Cymbalta into the beginning of 2010 but at her March 2010 appointment, she had stopped taking it and told Havens that she did not feel it was effective. Kerri Jackson, FNP, prescribed her Effexor. Havens

---

[1] She had apparently stopped taking the Effexor at some point.

completed a form assessing Smith's mental ability to do work-related activities and opined that Smith was "unable to function at all outside of functioning in daily living skills." (R. at 381.)

In October 2009, Smith was examined by Samuel Breeding, M.D. for her elbow problems. Though Dr. Breeding found that she had normal, though slightly guarded, range of motion of her left elbow and mild tenderness on palpitation of the medial epicondyle, he concluded that she was unable to do gainful employment and that due to her recurrent left elbow pain and major depression she could not do light work.

Smith's hearing before the ALJ occurred on April 21, 2010. Smith testified that since her surgery, she could no longer lift over ten or twenty pounds and was in constant pain. She stated that she had no problems walking, standing or sitting. She described her feelings of depression including feeling that she doesn't want anyone else around and just wants to be by herself. She stated that she sought treatment from Havens for the depression and anxiety because she "needed somebody to talk to." (R. at 30.) She has never sought emergency treatment for the depression or panic attacks. She stated that she did dress herself, comb her hair and bathe herself without problems.

The ALJ asked the vocational expert to consider several hypotheticals. She asked him to consider an individual who was limited to lifting and carrying no

more than twenty pounds occasionally and ten pounds frequently, standing and walking no more than six hours in an eight hour day and sitting no more than six hours in an eight hour day. She further limited the hypothetical to an individual who could only occasionally reach overhead with the left arm and who could not perform repetitive grasping. She also limited it to a person who could only perform simple, routine repetitive tasks. Considering all these limitations, the vocational expert testified that the hypothetical person could perform work as a fruit distributor, counter clerk and usher.

In her opinion, the ALJ determined that Smith was "status post left medial partial epicondylectomy" and has myofacial pain syndrome and that these impairments are "severe" under the meaning of the Regulations. (R. at 14.) She concluded that these impairments did not meet the listing criteria for a disability. She further concluded that Smith had the residual functional capacity to perform light work except for that which requires repetitive grasping or more than occasional overhead reaching with the upper left arm, as well as that which consist of more than simple, repetitive unskilled tasks. Based on these findings and the vocational expert's testimony, the ALJ concluded that Smith cannot perform her past relevant work as a CAN, but a significant number of jobs do exist in the national economy which she can perform. Smith now argues that the ALJ's

decision is not supported by substantial evidence.  For the reasons below, I disagree.

III

The plaintiff bears the burden of proving that she is under a disability. *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972).  The standard for disability is strict.  The plaintiff must show that her "physical or mental impairment or impairments are of such severity that [s]he is not only unable to do [her] previous work but cannot, considering [her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . ." 42 U.S.C.A. §§ 423(d)(2)(A); 1382c(a)(3)(B).

In assessing disability claims, the Commissioner applies a five-step sequential evaluation process. The Commissioner considers whether the claimant: (1) has worked during the alleged period of disability; (2) has a severe impairment; (3) has a condition that meets or equals the severity of a listed impairment; (4) could return to her past relevant work; and (5) if not, whether she could perform other work present in the national economy.  *See* 20 C.F.R. §§ 404.1520(a)(4); 416.920(a)(4) (2011).  If it is determined at any point in the five-step analysis that the claimant is not disabled, the inquiry immediately ceases.  *Id*.  The fourth and fifth steps of the inquiry require an assessment of the claimant's RFC, which is

then compared with the physical and mental demands of the claimant's past relevant work and of other work present in the national economy. *Id.*; *Johnson v. Barnhart*, 434 F.3d 650, 653-54 (4th Cir. 2005).

In accordance with the Act, I must uphold the Commissioner's findings if substantial evidence supports them and the findings were reached through application of the correct legal standard. *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996). Substantial evidence means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (internal quotation marks and citation omitted). Substantial evidence is "more than a mere scintilla of evidence but may be somewhat less than a preponderance." *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966). It is the role of the ALJ to resolve evidentiary conflicts, including inconsistencies in the evidence. *Seacrist v. Weinberger*, 538 F.2d 1054, 1056-57 (4th Cir. 1976). It is not the role of this court to substitute its judgment for that of the Commissioner. *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990).

Smith argues that the ALJ's finding that she had no severe mental impairment is not supported by the evidence. An impairment or combination of impairments is not severe if it does not significantly limit a claimant's physical or mental ability to do basic work activities as defined by the regulation. 20 C.F.R. §§ 404.1521; 416.921 (2011). Relying primarily on the report of Dr. Leizer, the

ALJ concluded that Smith had only mild limitation in the area of daily living, no limitation in social functioning and concentration or persistence or pace, and had experienced no episodes of decompensation. 20 C.F.R. §§ 404.1520a; 416.920a (2011). The regulations state that if the degree of limitation in these first three categories is "none" or "mild" and there are no episodes of decompensation, then the general conclusion is that the mental impairment is not severe. 20 C.F.R. §§ 404.1520a(d)(1); 416.920a(d)(1) (2011). The ALJ found that Smith's depression "does not cause more than minimal limitation in [her] ability to perform basic mental work activities and is therefore non-severe." (R. at 15.)

The ALJ's decision to accord less weight to the opinion of Dr. Ludgate as to Stanley's mental impairment was within her discretion. 20 C.F.R. §§ 404.1527(d); 416.927(d). The ALJ noted that Dr. Ludgate had only seen Smith once and that his opinion of the severity of her impairment was inconsistent with the record as a whole and his own clinical evaluation. *See Craig*, 76 F.3d at 590 ("[I]f a physician's opinion is not supported by clinical evidence or if it is inconsistent with other substantial evidence, it should be accorded significantly less weight."). The ALJ was also within her discretion to give less weight to the opinion of Havens as it was contradicted by the record.[2]

---

[2] The ALJ did consider Havens' opinion even though Havens is not an "acceptable medical source" under the regulations. *See* 20 C.F.R. §§ 404.1513; 416.913 (2011).

Smith argues that the ALJ's assessment of her RFC contradicts the ALJ's conclusion that her depression was not a severe impairment because the ALJ included limitations in her RFC based on the depression. The ALJ stated that

> [a]lthough depression does not cause significant work-related limitations, this [ALJ], in an effort to afford claimant every possible benefit, finds that capacity for work at the light level of exertion is further reduced by inability to perform more than simple, routine, repetitive tasks that are unskilled in nature.

(R. at 19.) The regulations provide that in determining a claimant's RFC, the ALJ will consider all "medically determinable impairments," including those which are not severe. 20 C.F.R. §§ 404.1545(e); 416.945(e) (2011). The ALJ properly considered Smith's depression, which is an impairment even if not severe, when determining her RFC.

Smith also argues that the ALJ improperly discounted the opinion of Dr. Breeding that she is unable to perform light work on a consistent basis. As the ALJ noted, Dr. Breeding's conclusion was based on a one-time assessment of Smith and is not supported by the other evidence in the record or Dr. Breeding's own assessment. Dr. Breeding concluded that Smith could not work even though he found only minimal impairment to her elbow. His conclusion also contradicted Smith's long-term treating physicians and the state agency physician. Even though Drs. Hagan and Swanson last saw Smith some time before the administrative hearing, her condition has remained essentially the same since the return of her

pain post-surgery in August 2004. Her complaints have remained consistent and her treatment regimen has remained basically the same. Dr. Breeding's assessment was consistent with this history and yet his opinion directly contradicted it. The ALJ properly accorded Dr. Breeding's opinion little weight.

Finally, Smith argues that the ALJ improperly failed to consider the report of the psychiatric nurse practitioner, Juliana Frosch. The ALJ did not mention this one-page report but the omission was not prejudicial to Smith as the report reiterated the diagnosis of depression and anxiety found elsewhere in the record and considered by the ALJ. (*See* R. at 18 (referring to treatment notes from the Abingdon Center diagnosing Smith with recurrent major depressive disorder and panic disorder).)

IV

For the foregoing reasons, the plaintiff's Motion for Summary Judgment will be denied, and the defendant's Motion for Summary Judgment will be granted. A final judgment will be entered affirming the Commissioner's final decision denying benefits.

DATED: November 30, 2011

/s/ James P. Jones
United States District Judge